# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JULIE GALE,

       Plaintiff,

    v.                      **Case No. 2:18-cv-92**
                                **Magistrate Judge Chelsey M. Vascura**

TRINITY HEALTH SYSTEMS,

          **Defendant.**

## OPINION AND ORDER

Plaintiff, Julie Gale ("Plaintiff"), asserts disability discrimination and retaliation claims against her former employer, Trinity Health Systems ("Trinity"), pursuant to Title 1 of the Americans with Disabilities Act, 42 U.S.C. 12101 *et. seq*., and the Ohio Civil Rights Act, O.R.C. § 4112 *et. seq.* (ECF No. 2.) This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1367(a). This matter is before the Court for consideration of Trinity's Motion for Summary Judgment and Memorandum in Support, Plaintiff's Opposition thereto, and Trinity's Reply. (ECF Nos. 24, 25, 30, and 35.) Also before the Court is Trinity's Motion to Strike certain portions of affidavits supplied by Plaintiff in opposition to Trinity's Motion for Summary Judgment, Plaintiff's Opposition thereto, and Trinity's Reply (ECF Nos. 34, 37, and 39), as well as Trinity's Motion for Hearing on its Motion for Summary Judgment (ECF No. 40), to which Plaintiff did not respond. For the reasons that follow, Trinity's Motion for Hearing is **DENIED**. Trinity's Motion to Strike is also **DENIED** for the reasons set forth below. Trinity's Motion for Summary Judgment is **GRANTED in part and DENIED in part**, as set forth

herein.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff is a 26-year old woman who was born with spina bifida, a congenital neural tube defect that occurs when the spine and spinal cord do not form properly. As a result, Plaintiff experiences physical limitations that affect her gait and require her to wear leg braces, as well as alleged cognitive delays. Trinity is a hospital located in Ohio.

Sometime prior to 2016, Plaintiff completed a medical assisting program that included training in the performance of EKG tests.[1] Upon completing her training, in June 2016, Plaintiff applied for a position as an EKG technician at Trinity. Trinity interviewed Plaintiff and later offered her the position conditional upon Plaintiff demonstrating in a functional capacity evaluation ("FCE") performed by Trinity that she could meet the physical demands of the position. The physical demands required by Trinity, as set forth in Trinity's written position description, included the ability to frequently push, pull, lift, and carry up to a maximum of 50 pounds. (Mot. S.J. at Ex. E, ECF No. 25-5.)

On June 22, 2016, an athletic trainer employed by Trinity performed an FCE of Plaintiff. According to Plaintiff, "[t]he physical evaluation lasted about half an hour and included lifting, pulling, and pushing boxes with various weights inside of them." (Pl. Aff. ¶ 15, ECF No. 3-4.) Plaintiff avers that the examiner "appeared to be nervous about the potential for me to get hurt during the evaluation," and "made me stop performing the lifting, pulling, or pushing at her command . . . without asking me if I felt comfortable going further." (*Id.* at ¶¶ 17, 18.) Plaintiff further states that the examiner "did not ask me any questions about my prior work history or

---

[1] A person performs an EKG test by placing 12 electrodes on a patient's body while the patient is lying flat on her back on a hospital bed or cart. The electrodes are attached to a machine that reads and records electrical activity in the body.

capabilities." (*Id.* at ¶ 20.) Ultimately, the Trinity examiner concluded that Plaintiff "[c]annot meet [the] 50lb physical requirements due to [leg] braces, requiring knees to be together when bending," and that Plaintiff has "balance problems and gait problems." (University of Pittsburg Medical Center ("UPMC") FCE at 3, ECF No. 30-5 (quoting portions of the Trinity FCE).) The examiner further concluded that Plaintiff can push and pull only up to ten pounds, and that she could hardly lift or carry more than five pounds. (Trinity FCE at 3, ECF No. 25-4.) In addition, the examiner indicated that Plaintiff "has significant balance problems when carrying weight, pushing, or pulling." (*Id.*) The examiner further stated that "[i]f required to consistently lift or carry weighted items, [Plaintiff] will be at risk for injury." (*Id.*) Based on the FCE, Trinity concluded that Plaintiff could not meet the physical demands of the EKG technician position and rescinded its offer of employment.

Plaintiff's parents, both long-time employees of Trinity, thereafter initiated discussions with Trinity to advocate for their daughter. Plaintiff's mother, Mary Gale, had worked for Trinity as a Registered Nurse ("RN") since 1988. Plaintiff's father, John Gale, had worked for Trinity since 2011, first as a member of housekeeping and later as a respiratory therapist. Mary and John Gale voiced concern over the accuracy of the FCE based upon their knowledge of their daughter's capabilities and offered to have another FCE performed by UPMC, where Plaintiff's long-time physical rehabilitation doctor practices. Trinity allegedly "agreed that getting another physical exam was a good idea." (J. Gale Aff. ¶ 18, ECF No. 30-3.)

Plaintiff's parents also questioned whether the ability to push, pull, lift, and carry 50 pounds was actually necessary to perform as an EKG technician. They both indicated to Trinity that in the many years they worked there, they had never observed an EKG technician in a position that would require such physical capabilities. Trinity responded that the physical

requirements were necessary to ensure an EKG technician could lift or otherwise physically assist a patient if the need arose. According to both Mary and John Gale, however, Trinity's Chief Operating Officer ("COO"), Joanne Mulrooney, agreed that Trinity's EKG technicians do not lift patients. In addition, John Gale avers that during similar discussions, Trinity's Chief Executive Officer ("CEO") stated that it "sound[s] like the EKG Technician job position, with its 50 pound lifting requirement for a duration of two and a half to five and a half hours per day, needed to be revised." (*Id.* at ¶ 22.) Nevertheless, Trinity held firm in its refusal to hire Plaintiff for the position.

Plaintiff underwent another FCE at UPMC on August 1, 2018. This examination was more thorough, lasting approximately two hours. The examiner considered Plaintiff's medical history as well as her work history and self-reported capabilities. The examination revealed no balance problems, with the examiner explicitly noting that Plaintiff could perform pushing and pulling "without loss of balance." (UPMC FCE at 5, ECF No. 25-8.) The examiner also noted that Plaintiff "did not appear unsafe" when she engaged in the requested activities, and that she "did not display inappropriate body mechanics when taking her baseline postural stature into account." (*Id.*) Ultimately, the examiner concluded that Plaintiff could push, pull, lift, and carry up to 20 to 25 pounds, not 50 pounds as Trinity's position description required, but stated Plaintiff "may be able to meet [the] criteria if she is able to work in a modified capacity (lifting to a maximum of 20-25 pounds), or if the job description is reviewed and deemed incorrect when compared with [the] actual demands required." (*Id.* at 8.)

Mary and John Gale provided the results of the UPMC FCE to Trinity and reiterated their belief that the 50-pound physical requirement did not accurately reflect the demands of the EKG technician position. In addition, they requested that if Trinity continued to insist on those

physical requirements, that it reasonably accommodate Plaintiff's disability by allowing her to seek assistance from others in the event she needed to lift or otherwise physically assist a patient. They voiced their belief that Trinity could readily provide such an accommodation because, in their experience as long-time Trinity employees, no Trinity staff member was ever required to lift or otherwise assist a patient without help. Trinity declined to accommodate Plaintiff in that way or otherwise alter its position, citing concern for patient safety and the safety of Plaintiff.

Although it declined to hire Plaintiff as an EKG technician, Trinity suggested to Mary and John Gale that Plaintiff apply for a clerical position at Trinity. Mary Gale allegedly informed Trinity's COO, Joanne Mulrooney, at that time that a clerical position "would not be [Plaintiff's] strong suit" and "that it would take [Plaintiff] longer to learn a position like that" because of her "cognitive issues." (M. Gale Aff. ¶ 26, ECF No. 30-2.) Several months later, however, Plaintiff applied for and was hired into the position of call coordinator at Trinity. Plaintiff assumed the position on October 24, 2016. As call coordinator, Plaintiff was required to answer calls from current and prospective patients seeking new or different providers, collect certain information from the callers, and schedule the callers to see a Trinity-affiliated physician. Within a short time period, Plaintiff's performance proved unsatisfactory. Plaintiff's supervisors met with her multiple times in the weeks that followed to discuss performance issues and provide additional coaching and training. Nevertheless, Plaintiff continued to demonstrate unsatisfactory performance, including by failing to schedule appointments for callers, obtain necessary information from callers, and provide appropriate follow up on calls. Plaintiff also garnered extremely poor feedback from anonymous secret shoppers who called Plaintiff. Ultimately, Trinity terminated Plaintiff on November 17, 2016, roughly three and a half weeks after she started, citing poor performance.

Plaintiff timely filed a discrimination charge with the Equal Opportunity Employment Commission ("EEOC") on December 20, 2016, and cross filed with the Ohio Civil Rights Commission on February 3, 2017.  The EEOC issued Plaintiff a Notice of Right to Sue on October 11, 2017.  Plaintiff then timely filed this action in the Franklin County Court of Common Pleas on January 4, 2018.  (ECF No. 1.)  Defendant removed the action to this Court on February 2, 2018.  (*Id.*)  With this background in mind, the Court now turns to the motions before it.

## II.  MOTION FOR HEARING

The Court first considers Trinity's Request for Hearing on its motion for summary judgment.  (ECF No. 40.)  This Court's Local Rules provide as follows:

> [I]f oral argument is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented, counsel may apply to the Court for argument.  This may be done by including the phrase "ORAL ARGUMENT REQUESTED" (or its equivalent) on the caption of the motion or on a memorandum."  The ground(s) for any such request shall be succinctly explained.  If the Court determines argument or a conference would be helpful, the Court will notify all parties.

S.D. Ohio Civ. R. 7.1(b)(2).  In addition to presenting its request by separate motion, Trinity states in its summary judgment motion that "oral argument is essential . . . given the complexity of the uncontroverted material facts and underlying legal analysis."  (S.J. Mot. at 2, ECF No. 24.)  Trinity provides no further explanation as to how a hearing would be essential or helpful to the resolution of its motion.  Nor does it appear from the record or the parties' briefing that a hearing would be essential or helpful.  Accordingly, Trinity's Motion is **DENIED**.

## III. MOTION TO STRIKE

The Court next considers Trinity's Motion to Strike portions of the affidavits of John Gale, Mary Gale, and Plaintiff that Plaintiff presented in opposition to Trinity's Motion for

Summary Judgment. (ECF No. 34.) "'An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) (quoting Fed. R. Civ. P. 56(c)(4)). Affidavits that do not satisfy these requirements may be stricken. *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp. 2d 948, 954 (S.D. Ohio 2000). In addition, "[i]t is well settled that courts should disregard conclusions of law (or 'ultimate fact') found in affidavits submitted for summary judgment." *Harrah's Entm't Inc. v. Ace Am. Ins. Co.*, 100 F. App'x 387, 394 (6th Cir. 2004).

Furthermore, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). When one party moves to strike an affidavit as contradictory to deposition testimony, the Court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006). If the Court finds that it does, it must strike those portions of the affidavit that contradict the deposition testimony "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.*

Here, Trinity first requests that the Court strike portions of the affidavits of John Gale and Mary Gale on the grounds that "they are not based on personal knowledge." (Mot. at 1, ECF No. 34.) Specifically, Trinity posits that portions of John Gale's affidavit "consist[] of statements purportedly describing his observations of EKG Technicians at Trinity," even though John Gale himself never worked as an EKG technician at Trinity. (*Id.* at 4.) Trinity challenges portions of

Mary Gale's affidavit on the same basis. Personal knowledge, however, includes first-hand observations. *See Alexander v. Kellogg USA, Inc.*, 674 F. App'x 496, 499 (6th Cir. 2017) (recognizing that personal knowledge includes "personal observations"). Thus, John and Mary Gale's statements concerning their observations of EKG technicians, though perhaps of less probative value than if John and Mary Gale themselves worked as Trinity EKG technicians, arise from personal knowledge and are admissible. As such, the Court declines to strike paragraphs 7 through 9 of John Gale's affidavit or paragraphs 5 through 9 and 11 through 17 of Mary Gale's affidavit.

Trinity next requests that the Court strike paragraphs 21 through 23 of John Gale's affidavit, asserting they consist of "conclusory statements about essential functions of EKG technicians based on nothing more than [John Gale's] speculation." (Mot. at 4, ECF No. 34.) The Court disagrees. In these paragraphs, John Gale recounts a conversation he had with Trinity's CEO, Joe Tasse, in which Mr. Tasse responded to Mr. Gale's assertion that the EKG technician position required no lifting by saying, "it sound[s] like the EKG Technician job position, with its 50 pound lifting requirement for a duration of two and a half to five and a half hours per day, needed to be revised." (J. Gale Aff. ¶¶ 21-23, ECF No. 30-3.) Mr. Gale's recount of this conversation is not only admissible as including a statement by party opponent, but Mr. Tasse's alleged response is directly relevant to the question of whether Trinity's physical requirements are essential to the EKG technician position, as explained below. *See* Fed. R. Evid. 801(d)(2).

Trinity also requests that the Court strike Paragraph 16 of John Gale's affidavit on the grounds that it consists of Mr. Gale's opinion as to the accuracy of the FCE Trinity performed on Plaintiff rather than personal knowledge. Again, however, this paragraph recounts a

conversation Mr. Gale had with Trinity COO Ms. Mulrooney regarding Plaintiff's abilities. The Court will consider the statements in the context of the parties' joint efforts to assess Plaintiff's abilities and the availability of a reasonable accommodation. It will not consider the statements as evidence of what occurred during the FCE, as Mr. Gale was not present for the FCE.

Finally, the Court declines to strike paragraphs 5 through 9 and 11 through 17 of Plaintiff's affidavit. Trinity posits that the statements contained in these paragraphs contradict her deposition testimony. The Court finds no contradiction between Plaintiff's deposition and her affidavit. Indeed, Trinity points to no contradictions, but rather advances arguments that go to the weight of the statements. (*See*, *e.g.*, Mot. at 2, ECF No. 34 ("Plaintiff now seeks to create a factual dispute by conflating her ability to perform certain daily tasks with her ability to lift fifty pounds as required in Trinity's EKG Technician position."; disputing that Plaintiff's "ability to perform EKG tests in school . . . prove her ability to perform the essential functions of the EKG Technician position.").) For all of these reasons, Plaintiff's Motion to Strike is **DENIED**.

## IV.  MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standards

#### 1.      Summary Judgment

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's

assertion of fact," then the Court may "consider the fact undisputed for purposes of the motion").

The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted), *cert. denied*, 565 U.S. 1157 (2010); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

### 2. Discrimination under the ADA and the Ohio Civil Rights Act

"The ADA makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of a disability.'" *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). "The statute defines 'discriminate' to include 'not making a reasonable accommodation to the known physical [or mental] limitations of an otherwise qualified individual with a disability' unless the employer 'can demonstrate that the accommodation would impose undue hardship.'" *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)).

A plaintiff may base an ADA claim on direct or indirect evidence. "'[I]f the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse

employment decision,'" the court analyzes the claim under a burden-shifting analysis. *Rorrer*,

743 F.3d at 1038 (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)).

"First, the plaintiff must establish a prima facie case by showing 'that he is disabled and

otherwise qualified for the position, either with or without reasonable accommodation.'" *Id.*

(quoting *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013)). An "otherwise qualified

individual" is someone who, "with or without reasonable accommodation, can perform the

essential functions of the employment position" in question. *Id.* (citing 42 U.S.C. § 12111(8)).

　　"Although the burden is on the plaintiff to show, as part of his prima facie case, that he is

a qualified individual, the employer 'has the burden of showing a particular job function is an

essential function of the job.'" *Supinski v. UPS*, 413 F. App'x 536, 540 (3d Cir. 2011) (quoting

*Rehrs v. Iams Co.,* 486 F.3d 353, 356 (8th Cir. 2007)); *see also Kiphart v. Saturn Corp.*, 251

F.3d 573 (6th Cir. 2001) (noting that the employer "bears the burden of proving that a challenged

job criterion is essential, and therefore a business necessity . . . ."). "'[E]ssential functions' refer

to job duties that are 'fundamental' rather than 'marginal.'" *Keith*, 703 F.3d at 925 (quoting 29

C.F.R. § 1630.2(n)(1)). As the Sixth Circuit has recognized, "[a] job function may be essential

because: (1) the position exists to perform that function; (2) there are a limited number of

employees available among whom the performance of that job function can be distributed; or (3)

the function is highly specialized so that the incumbent position is hired for his or her expertise

or ability to perform the particular function." *Id.* (citing 29 C.F.R. § 1630(n)(2)). In determining

whether a job function is essential, the Court is to consider (1) the employer's judgment; (2) the

written job description; (3) the amount of time spent performing the function; (4) the

consequences of not requiring performance of the function; (5) the work experience of past

incumbents of the position; and (6) the current work experience of incumbents in similar jobs.

*Id.* at 925-26 (citing § 1630.2(n)(3)). "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Id.* at 926.

If a reasonable accommodation is needed for the plaintiff to perform an essential function of the position, the plaintiff "bears the initial burden of proposing an accommodation and showing that the accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). A reasonable accommodation may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . and other similar accommodations for individuals with disabilities." *Id.* (quoting 42 U.S.C. § 12111(a)). The ADA does not, however, require an employer "'to create new jobs [or] displace existing employees from their positions . . . in order to accommodate a disabled individual.'" *Id.* at 869 (quoting *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)). Further, "[a] suggested accommodation is not reasonable if it requires eliminating an 'essential' function of the job." *Rorrer*, 743 F.3d at 1039 (citing 29 C.F.R. § 1630.2(o) and 42 U.S.C. § 12111(8)).

Once the plaintiff has established a prima facie case of discrimination under this framework, "the burden shifts to the defendant to show that accommodating the plaintiff would impose an undue hardship on the operation of its business." *Id.* (citing *Monette*, 90 F.3d at 1183 n.10, 1186 ("The employer will bear the burden of proving . . . that a proposed accommodation would impose an undue hardship.")).

In the absence of direct evidence, a plaintiff pursuing a discrimination claim under the ADA must show "1) he or she is disabled; 2) [he or she is] otherwise qualified for the position, with or without reasonable accommodation; 3) [he or she] suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual

was replaced." *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011). The burden then shifts to the employer to "articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove the defendant's explanation is pretextual." *Id.*

In addition to the ADA, the Ohio Civil Rights Act renders it an "unlawful discriminatory practice" for an employer, "because of the . . . disability . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment[.]" Ohio Rev. Code § 4112.02. The same "analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013). Thus, disability discrimination claims brought under Ohio law are "evaluated concurrently and under the same standards as claims brought under the ADA." *Id.*

### 3.     ADA Retaliation

In addition to prohibiting discrimination based on a disability, the ADA mandates that "'[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Rorrer*, 743 F.3d at 1025 (quoting 42 U.S.C. § 12203(a)). Where, as here, the plaintiff has offered no direct evidence of unlawful retaliation, a plaintiff pursuing a retaliation claim under the ADA must establish a prima facie case of retaliation by establishing that 1) the plaintiff engaged in activity protected under the ADA; 2) the employer knew of the activity; 3) the employer took an adverse action against the plaintiff; and 4) there was a causal connection between he protected activity and the adverse action. *Id.* at 1046. "Significantly, the causation

prong requires [the plaintiff] to show but-for causation." *Barlia v. MWI Veterinary Supply Inc.,* 721 F. App'x 439, 450 (6th Cir. 2018). If the plaintiff overcomes this burden, the defendant "must articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (citing *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997)). If defendant does so, the burden shifts back to the plaintiff to show that the proffered reason for the action was "merely pretext." *Id.*

**B.      Analysis**

Plaintiff asserts claims that Trinity (1) discriminated against her on the basis of disability in refusing to hire her as an EKG technician; (2) discriminated against her on the basis of disability in terminating her from the call coordinator position; and (3) retaliated against her for requesting a reasonable accommodation by refusing to hire her as an EKG technician and terminating her from the call coordinator position. Trinity moves for summary judgment on each of these three claims, and for purposes of this motion, does not dispute that Plaintiff is disabled within the meaning of the ADA and the Ohio Civil Rights Act. The Court considers Trinity's Motion with respect to each claim below.

**1.   Discrimination Claim Related to the EKG Technician Position**

Turning first to Trinity's refusal to hire Plaintiff as an EKG technician, Trinity maintains it is entitled to summary judgment on this claim because Plaintiff cannot establish that she is otherwise qualified to perform the essential functions of the position. Specifically, Trinity posits that the ability to be able to frequently push, pull, lift, and carry a maximum of 50 pounds is "essential" to the position, and Plaintiff indisputably cannot meet those qualifications. Relatedly, Trinity argues that because the physical requirement is "essential," Trinity has no obligation to accommodate Plaintiff by allowing others to assist as necessary. The Court addresses each of Trinity's contentions in turn.

### a. Whether the Physical Requirement is "Essential"

The Court finds that, based upon the record before it, a genuine issue of material fact exists as to whether the ability to push, pull, lift, and carry up to 50 pounds is essential to the position of EKG technician. "The determination of whether physical requirements are essential functions of a job requires the court to engage in a highly *fact specific* inquiry." *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988) (emphasis in original). The inquiry "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 472 (6th Cir. 1993) (internal quotations omitted). To warrant summary judgment, there must be no question of fact that an employer's physical requirements "'reflect a well-informed judgment grounded in careful and open-minded weighing of the risks and alternatives,'" rather than "'conclusory statements that are being used to justify reflexive reactions grounded in ignorance or capitulation to public prejudice.'" *Taylor v. United States Postal Serv.*, No. 93-3502, 1995 WL 57410, at *5 (6th Cir. Feb. 10, 1995) (quoting *Arline v. Sch. Bd. of Nassau Cnty.*, 772 F.2d 759, 764-65 (11th Cir. 1985), *aff'd*, 480 U.S. 273 (1987) (analyzing claims under the Rehabilitation Act)).

Here, Trinity advances evidence in two forms to support its position that the 50-pound requirement is essential. First, Trinity points out that its written position description mandates that an EKG technician be able to meet the 50-pound physical requirement. As Trinity recognizes, however, a written position description is not dispositive. *See Rorrer*, 743 F.3d at 1039. Moreover, Plaintiff presented evidence that Trinity's CEO and COO both made statements that tend to contradict the position description. For example, John Gale indicates that Trinity's CEO, Joe Tasse, stated that it "sound[s] like the EKG Technician job position, [with

15

respect to the physical limitations], needed to be revised." (J. Gale Aff. ¶ 22, ECF No. 30-3.) In addition, both John and Mary Gale aver that Joanne Mulrooney, Trinity's COO, agreed that EKG technicians do not engage in lifting. (M. Gale Aff. ¶ 24., ECF No. 30-2.) These statements undercut the persuasiveness of the position description. *See Rorrer*, 743 at 1040 ("Testimony from the plaintiff's supervisor that a job function is actually marginal may effectively rebut a written description that states that a job function is essential.").

Second, Trinity presents testimony demonstrating that, in its judgment, the 50-pound physical requirement is necessary to ensure an applicant can perform the essential functions of (1) lifting or otherwise assisting patients without help from others as needed; and (2) pushing the EKG cart as well as patients in wheelchairs as needed. Each assertion is discussed separately below. Although only tangentially raised by Trinity, the Court must also consider whether (3) Plaintiff's alleged difficulty with balance would prevent her from performing the essential functions of the job. The Court finds that a genuine issue of material fact exits on each of these three fronts.

### i. Lift or Otherwise Assist Patients

First, the Court finds that an issue of fact exists as to whether Trinity EKG technicians actually have to lift or otherwise physically assist patients without help. Trinity's corporate representative defended the 50-pound physical requirement as necessary in case "patients would need assistance," including "obese patients that need assistance to the [EKG] cart" or "elderly patients." (Mazzone Dep. at 26-28, ECF No. 30-1.) Plaintiff, however, presented evidence that no hospital staff member, including EKG technicians, is ever required to assist a patient to move from one place to another without help. Mary Gale worked as an RN at Trinity for nearly thirty years. (M. Gale Aff. ¶¶ 2-3, ECF No. 30-2.) She states: "In my experience working at Trinity,

the practice for lifting any patients was for either two or four staff members to lift patients," and that "if a patient needed assistance, walking to the restroom for example, each staff member would assess whether or not they would need extra staff assistance for that patient." (*Id.* at ¶¶ 5-6.) In addition, Mrs. Gale avers that "[i]f a patient was seated when an EKG Technician arrived to perform a test, the EKG Technician would tell us, the nurses on the Unit, to assist the patient into bed," and that she "never saw any EKG Technician lift a patient or have to solely assist a patient by themselves." (*Id.* at ¶¶ 11, 13.) Rather, she states that "the only job duties I ever saw an EKG Technician perform were to wheel the EKG cart into a patient's room, apply the electrode stickers, and perform the test." (*Id.* at ¶ 12.) John Gale worked for Trinity since 2011, first as a member of housekeeping and later as a respiratory therapist. He consistently avers that "Trinity employees who provided direct patient care, such as nurses, would often ask me to assist them with lifting patients." (J. Gale Aff. ¶ 5, ECF No. 30-3.) In addition, he states he has "witnessed Trinity staff regularly seek assistance from other staff members nearby in the event that a patient needed to be lifted or assisted." (*Id.* at ¶ 6.) Moreover, John Gale stated that in his experience performing EKG tests at other hospitals, he has never had to lift or otherwise physically assist a patient alone in connection with performing the test.

Trinity asks the Court to disregard the testimony of Mary and John Gale on the grounds that they themselves never worked as EKG technicians or supervised EKG technicians at Trinity. The Court acknowledges that a jury may find Trinity's evidence more probative than Plaintiff's for a variety of reasons. Nevertheless, a reasonable jury could find Mary and John Gale's combined thirty-five years of observations of EKG technicians at Trinity persuasive. *See*, *e.g.*, *Hall*, 857 F.2d at 1079 (finding a question of fact existed as to whether a 70-pound lifting requirement was essential where the plaintiff testified that he never saw a distribution clerk lift

70 pounds when he worked for the defendant in another position).

In addition to the testimony of Mary and John Gale, Plaintiff's testimony, as well as alleged statements by Trinity employees, support the view that an EKG technician need not be able to lift or otherwise physically assist patients alone.  Plaintiff states that she performed EKG tests during her six-to-eight weeks of clinical experience as part of her medical assistance training, and avers that she never was required to lift 50 pounds.  (Pl. Aff. ¶¶ 3-9, ECF No. 30-4.)  In addition, in response to Mary Gale's insistence that "you and I both know that EKG Technicians do not lift," Trinity's COO, Joanne Mulrooney, allegedly "agreed . . . that Trinity's EKG Technicians do not lift."  (M. Gale Aff. ¶¶ 23, 24, ECF No. 30-2.)  John Gale confirms this account.  (*See* J. Gale Aff. ¶ 15, ECF No. 30-3 ("In the meeting with Joanne Mulrooney, Joanne agreed that Trinity's EKG Technicians do not perform lifting.").)  Similarly, Trinity's CEO, Joe Tasse, allegedly stated that "the EKG Technician job position, with its 50 pound lifting requirement for a duration of two and a half to five and a half hours per day, needed to be revised."  (*Id.* at ¶ 22.)  These statements further demonstrate the existence of a genuine issue of material fact.  *Cf. Rorrer*, 743 F.3d at 1040 ("[T]estimony from the plaintiff's supervisor that a job function is actually marginal may effectively rebut a written description that states a job function is essential.").  Accordingly, the record does not establish as a matter of law that Trinity's physical requirements are necessary to perform the essential function of lifting or otherwise physically assisting patients.

### ii.    Push the EKG Machine and Patients in Wheelchairs

Trinity also maintains that the 50-pound physical requirement is necessary to ensure that an EKG technician can perform the essential functions of pushing the EKG machine on a

wheeled cart to patient rooms to perform EKG tests, as well as pushing patients in wheelchairs.[2] Plaintiff does not dispute that pushing the EKG cart and patients in wheelchairs are essential functions of an EKG technician. She does, however, dispute that one must be capable of pushing, pulling, lifting, or carrying 50 pounds to perform those functions.

Although Plaintiff concedes that she is unable to push or pull 50 pounds, she avers that as part of her medical assistance training, she "had to wheel an EKG machine to a bed with a dummy" to simulate EKG examinations, and that she was able to do so "without any assistance or accommodation." (Pl. Aff. ¶¶ 7, 9, ECF No. 30-4.) Plaintiff further states that during the FCE performed at UPMC, the examiner "asked [her] to push [her] father in a wheelchair," and says she "was able to push him in the wheelchair without any difficulty." (*Id.* at ¶ 24.) Plaintiff's father reportedly weighed 250 pounds at the time. In addition, Plaintiff indicates that she regularly grocery shops for her family, "during which [she] push[es] a cart full of groceries without any difficulty." (*Id.* at ¶ 25.) Thus, Plaintiff disputes that one must be able to push, pull, lift, or carry 50 pounds in order to push an EKG cart or patients in a wheelchair.

Trinity has failed to offer evidence that its 50-pound requirement reflects the force needed to push an EKG cart or a patient in a wheelchair. To be sure, Trinity points out that the EKG machine weighs 80 pounds. But wheels unquestionably reduce the amount of force needed to push an object. The record does not establish that one must be capable of pushing 50 pounds to push an 80-pound object on wheels or, for that matter, a person in a wheelchair. In fact, Trinity's corporate representative and supervisor of EKG technicians could not explain why the physical requirement was set at 50 pounds in particular. (*See* Mazzone Dep. at 30, ECF No. 30-

---

[2] In addition to performing EKG tests on patients in the hospital, Trinity's EKG technicians perform EKG tests on patients who visit an outpatient wing of the hospital. Those patients may be wheelchair bound and may need to be pushed to or from the EKG testing area.

1) (saying merely that 50 pounds was "the requirement set by the hospital" at some point before she started working there, specifically, "[she] would imagine," by human resources).) In the absence of any evidence to this effect, no reasonable jury could find that an EKG technician must be able to push 50 pounds to push an EKG cart on wheels or wheelchaired patient. This is particularly the case given that Plaintiff, who indisputably cannot push 50 pounds, offered uncontroverted testimony that she can safely and comfortably perform these tasks. As such, a genuine issue of material fact remains.

### iii. Plaintiff's Alleged Difficulty with Balance

Last, the Court considers whether the record establishes as a matter of law that Plaintiff cannot perform the essential functions of an EKG technician due to alleged balance problems. Trinity's FCE resulted in a finding that Plaintiff experiences "significant balance problems when carrying weight, pushing, or pulling." (Trinity FCE at 3, ECF No. 25-4.) The Court must therefore consider whether balance issues prevent Plaintiff from pushing the EKG cart and wheelchaired patients which, at least for purposes of this motion, are indisputably essential functions of the job. The Court does not so find.[3]

As an initial matter, the Court cannot conclude on the record before it that Trinity was justified in relying solely on the results of its FCE in determining that Plaintiff experiences difficulty with balance. Although in many circumstances an employer will be permitted to rely

---

[3]Although Trinity contends generally that its FCE establishes that Plaintiff cannot meet the physical demands of the position, it does not explicitly argue that alleged balance problems prevent Plaintiff from pushing an EKG cart or a wheelchaired patient (though it does assert that balance problems prevent Plaintiff from lifting or otherwise physically assisting patients without help). Given that Plaintiff does not dispute that pushing EKG carts and wheelchaired patients is essential to the position, the Court considers whether the results of the FCE with respect to balance would preclude a reasonable jury from finding that Plaintiff could perform those tasks.

upon its own examination to determine an individual's physical capabilities, "[t]he ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000). Courts will not defer to the opinion of a medical professional that is not based on an individualized inquiry or supported by objective medical evidence. *Id.* "A proper evaluation involves consideration of the applicant's personal characteristics, h[er] actual medical condition, and the effect, if any, the condition may have on h[er] ability to perform the job in question." *Keith*, 703 F.3d at 923. Ultimately, "the ADA's prohibitions against employment discrimination expressly extend to medical examinations and inquiries." *Holiday*, 206 F.3d at 644. As such, an employer may not rely upon a "cursory medical examination" based upon stereotypical misperceptions instead of actual abilities. *Keith*, 703 F.3d at 924.

Here, the record is undeveloped on the issue of whether Trinity's FCE, and thus its determination regarding Plaintiff's balance, was based upon the type of individualized inquiry required by the ADA. Trinity provides little evidence regarding the FCE other than its results. On the other hand, Plaintiff presents evidence (but no argument) that suggests the FCE was not based upon an individualized inquiry.

For example, Plaintiff avers that the Trinity FCE lasted "about half an hour." (Pl. Aff. ¶ 15, ECF No. 30-4.) She states that the examiner "did not ask me any questions about my prior work history or capabilities." (*Id.* at ¶ 20.); *see also Holiday*, 206 F.3d at 644 (question of fact existed in part because the employer and examining physician failed to consider the plaintiff's prior work history as a police officer when determining he lacked the abilities to perform as a police officer). Plaintiff further indicates that the examiner appeared to be "nervous about the potential for [her] to get hurt during the evaluation." (Pl. Aff. ¶ 17, ECF No. 30-4.) In contrast,

the UPMC FCE lasted four times as long, was performed at a facility familiar with Plaintiff's medical condition and history, and took Plaintiff's work experience into account. In direct contradiction of Trinity's FCE, the UPMC FCE revealed Plaintiff has no difficulty with balance at all, even when pushing and pulling. *See, e.g.*, *Miller v. Ill. DOT*, 643 F.3d 190, 194-95, 197 (7th Cir. 2011) (issue of fact as to individualized inquiry where the plaintiff offered the employer opinions of two psychiatrists that contradicted the limitations found by the employer's psychiatrist).

Moreover, the record fails to establish that Trinity considered anything other than its own FCE in determining whether Plaintiff had balance problems. In addition to providing Trinity with the second FCE, Plaintiff's parents voiced concern to Trinity that its FCE results were inaccurate based on their knowledge of their daughter's abilities. Nevertheless, Joeann Mulrooney allegedly told Mary Gale that "there was nothing she could do based upon the results of [the Trinity FCE]." (M. Gale Aff. ¶ 23, ECF No. 30-2.) Similarly, even after allegedly agreeing that Trinity technicians do not engage in lifting, Ms. Mulrooney reiterated that "she was unable to help [Plaintiff] get th[e] job because of the results of the FCE." (*Id.* at ¶ 24.) Based upon this record, the Court cannot conclude that Trinity or its FCE examiner engaged in the type of reasonable inquiry mandated by the ADA. As a result, a genuine issue of material fact exists as to whether Plaintiff experiences balance problems that would prevent her from performing the essential functions of EKG technician.

### b. Reasonable Accommodation

Trinity also seeks summary judgment on the grounds that the accommodation proposed by Plaintiff, namely that she be able to seek assistance to meet the physical demands of the job, was unreasonable as a matter of law. The Court disagrees.

Trinity raises just one argument to challenge the reasonableness of Plaintiff's proposed accommodation: it argues that an accommodation is unreasonable if it requires the employer to eliminate an essential function of the job. *See Rorer*, 743 F.3d at 1039. That may be so; however, the Court finds a fact issue exists with regard to whether lifting or physically assisting patients is indeed essential. Reasonable accommodations commonly include reallocating non-essential functions to others. *Kleiber*, 485 F.3d at 868. Moreover, while not required to eliminate essential functions, an employer may be required to accommodate an employee by providing assistance with essential functions. *See*, *e.g.*, *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 902 (8th Cir. 2006) (finding no dispute that plaintiff could not herself perform the essential function of driving, but finding a reasonable accommodation could include permitting the plaintiff to arrange for his own transportation to and from customer locations). Moreover, Plaintiff presents evidence that the proposed accommodation is both reasonable and practical—namely, evidence that as a matter of course, all Trinity staff members have the option to seek assistance when physically assisting patients. Thus, the Court finds a genuine issue of material fact remains as to the reasonableness of Plaintiff's proposed accommodation. For this and the reasons set forth above, Trinity's request for summary judgment on this claim is denied.

### 2. Discrimination Related to the Call Coordinator Position

The Court next turns to Trinity's request for summary judgment on Plaintiff's discrimination claim as it relates to the call coordinator position. The Court concludes that summary judgment is proper on this claim.

As an initial matter, Plaintiff failed to adduce evidence that Trinity knew of her alleged learning disability or that she requested Trinity accommodate her with additional time. Plaintiff admits that she did not tell anyone at Trinity that she experiences cognitive delays or request any

accommodation for her alleged learning disability—even during the multiple meetings she had with her supervisors regarding her poor performance. (Pl. Dep. at 122-23, 224-25, 236, ECF No. 25-3.) Plaintiff nevertheless points out that when Trinity rescinded its offer for an EKG technician position in June 2016 and suggested Plaintiff instead apply for a clerical position, Mary Gale informed Joeann Mulrooney that such a position "would not be [Plaintiff's] strong suit . . . because of her cognitive issues," and that "it would take [Plaintiff] longer to learn a position like that." (M. Gale Aff. ¶ 26, ECF No. 30-2.) But that statement was made in connection with the EKG position several months before Plaintiff even applied for the call coordinator position. Aside from this vague reference to "cognitive issues," there is no evidence that anyone said anything to Trinity about a learning disability, much less a need to accommodate it with additional learning time and training.

More importantly, Plaintiff has adduced no evidence that she was qualified to perform the essential functions of a call coordinator even with reasonable accommodation. Plaintiff "bears the initial burden of proposing an accommodation and showing that the accommodation is objectively reasonable." *Kleiber*, 485 F.3d at 868. To be reasonable, a proposed accommodation must also be effective, meaning it must permit the plaintiff to perform the essential functions of the job. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017) (emphasizing that to be reasonable, an accommodation must be effective) (relying upon *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002)); *cf. McDonald v. UAW-GM Ctr. For Human Res.,* 738 F. App'x 848, 854 (6th Cir. 2018) (noting that an employer may choose among one or more "*effective*" accommodations) (emphasis added).

Here, Plaintiff argues in effect that although she experienced performance problems during her three-and-a-half weeks as a call coordinator, with the accommodation of more time to

learn and practice she could have performed the essential functions satisfactorily. The problem with Plaintiff's argument is that she provides no evidence that more time would have been an *effective* accommodation, meaning that with more time she could have performed satisfactorily. The record demonstrates that within days of starting as a call coordinator, Plaintiff revealed to her supervisors that she had a "phobia" of talking on the phone. In the three-and-a-half weeks that followed, despite additional coaching and training, Plaintiff failed to schedule appointments for callers, failed to acquire certain necessary information from callers, and garnered very poor feedback from secret shopper callers. The record contains no evidence reflecting that with additional time Plaintiff could reliably perform these and other essential functions of the job. *See*, *e.g.*, *LeFebvre v. Astrue*, No. 1:05-cv-255, 2008 WL 570942, at *22 (D. Vt. Feb. 28, 2008) ("[The plaintiff's] claim here is that, given adequate training, he could have performed his job without any accommodations"; however, "he has failed to show that more classroom training would have been an effective accommodation.").

Even if effective, Plaintiff has offered no evidence that her proposed accommodation was reasonable. In her three-and-a-half weeks as call coordinator, Plaintiff failed to perform the primary function of a call coordinator: scheduling callers to see a Trinity-related physician. It is only logical to conclude that this and Plaintiff's other failures posed the risk of Trinity losing business. Particularly because Plaintiff showed no signs of improvement in her three-and-a-half weeks on the job, it would be unreasonable to require Trinity to keep Plaintiff in the position with the hope she might someday improve, all the while putting business prospects at risk. Summary judgment is thus proper on this claim.

### 3. Retaliation

Summary judgment is also proper on Plaintiff's retaliation claim. Plaintiff alleges that

Trinity rescinded its offer for the position of EKG technician in retaliation for Plaintiff requesting a reasonable accommodation for that position. She also alleges that Trinity terminated her from the call coordinator position in retaliation for her request for reasonable accommodation. Neither assertion is supported by the evidence.

Although a request for accommodation could constitute protected activity under the ADA, *see Barlia*, 721 F. App'x at 450-51, Plaintiff has offered no evidence of a causal connection between the request and Trinity's decision to not hire her as EKG technician or to fire her as call coordinator. First, Trinity rescinded its offer of employment for the EKG technician position *before* Plaintiff requested any accommodation, which means its decision could not have been retaliatory. Second, Plaintiff admits that she never requested accommodation for the call coordinator position. Even if her mother's statement that "it would take [Plaintiff] longer to learn" a clerical position could be construed as a request for accommodation, that statement was made before Trinity hired Plaintiff as call coordinator. If Trinity were determined to retaliate against Plaintiff for requesting an accommodation, it would make little sense to hire Plaintiff after she made the request only to then fire her three-and-a-half weeks later in retaliation. In addition, the causation prong requires Plaintiff to show "but-for causation." *Id.* at 450. In light of her unsatisfactory performance as call coordinator, Plaintiff cannot show that but for her request for accommodation, she would not have been terminated from that position.

In addition, Trinity has articulated a legitimate, non-discriminatory reason for terminating Plaintiff from the position of call coordinator, namely, Plaintiff's undisputed poor performance. Plaintiff has failed to adduce any evidence demonstrating that this reason was pretextual. To be sure, Plaintiff offers several speculative assertions in an effort to show Trinity's true motive was discrimination (*see* Pl. Op. at 31, ECF No. 30); however, these assertions fail to create a genuine

issue of material fact as to pretext.  As a result, summary judgment on this claim is appropriate.

**V.**

For the reasons set forth above, Defendant's Motion for Hearing (ECF No. 40) is **DENIED**.  Defendant's Motion to Strike (ECF No. 34) is also **DENIED** for the reasons set forth above.  Defendant's Motion for Summary Judgment (ECF No. 24) is **GRANTED in part and DENIED in part**.  Specifically, Defendant's Motion is **DENIED** with respect to Plaintiff's discrimination claims related to the position of EKG technician.  Defendant's Motion is **GRANTED** with respect to Plaintiff's discrimination claims related to the position of call coordinator and with respect to Plaintiff's retaliation claim.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE